Sean **BAHRI**; Dan Florea; Barbara Nelson; Victor Roberge; Melvin Espen; William Toles; Daphne Dalthorp; and Stephen Galas, Plaintiffs,

v.

**HOME DEPOT USA, INC., Defendant.**

**No. CV–00–1485–ST.**

United States District Court, D. Oregon.

Dec. 18, 2002.

Thomas M. Steenson, Steenson Schumann Tewksbury & Rose PC, Portland, OR, for Plaintiffs.

## OPINION

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Plaintiffs, Sean Bahri ("Bahri"), Dan Florea ("Florea"), Barbara Nelson ("Nelson"), Victor Roberge ("Roberge"), Melvin Espen ("Espen"), William Toles ("Toles"), Daphne Dalthorp ("Dalthorp"), and Stephen Galas ("Galas"), are former employees of defendant, Home Depot USA, Inc. ("Home Depot"). All plaintiffs worked in Home Depot's store in Tigard, Oregon ("the Tigard store").[1] They allege that after Scott Lundervold ("Lundervold") became the Store Manager of the Tigard store in July 1999, they were subjected to unlawful discrimination and retaliation based on their age and/or gender. The thrust of their allegations is that Lundervold sought to cut costs by eliminating older, higher paid workers. Plaintiffs allege that one of the Assistant Store Managers at the Tigard store, Robert Brownlie ("Brownlie"), shared Lundervold's desire to oust older workers and also subjected Nelson to gender-based harassment and discrimination, as explained in more detail below.[2]

On August 8, 2002, this court granted Dalthorp's Unopposed Motion to Dismiss

---

1. A parallel pending proceeding involves claims of age and/or gender discrimination against employees at two additional Home Depot stores, *Sharkey, et al. v. Home Depot USA, Inc.*, Civil No. 00–1038–ST (D.Or.2001).

2. The supporting materials concerning the pending motions include various affidavits, declarations, and deposition excerpts, each of which relate to a particular claim. Citations to affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit, declaration or page(s) of the deposition transcript. Where any individual has submitted more than one affidavit or declaration, the document referenced is further identified by noting the plaintiff whom it concerns, *e.g.* Hanchett Aff. (Espen) refers to the Affidavit of Todd A. Hanchett in Support of Defendant's Motion for Summary Judgment Against the Claims of Melvin Espen.

(docket # 141) and dismissed her claims with prejudice. *See* Minute Order (docket # 142). In the Third Amended Complaint, all remaining plaintiffs allege a claim (First Claim for Relief) for age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 USC § 623(a) and ORS 659.030(1)(a) and (b).[3] Plaintiff Nelson alleges a separate claim (Second Claim for Relief) for sexual harassment and sex discrimination under Title VII of the Civil Rights Act of 1965 ("Title VII"), 42 USC § 2000e–2 and ORS 659.030(1)(a) and (b). All remaining plaintiffs except Toles allege an additional claim (Third Claim for Relief) for retaliation in violation of ORS 659.030(1)(f) and the ADEA, 29 USC § 623(d), or Title VII, 42 USC § 2000e–3. Finally, all remaining plaintiffs except Espen[4] and Toles allege a claim (Fourth Claim for Relief) for wrongful termination under Oregon law.[5]

This court has jurisdiction over plaintiffs' ADEA and Title VII claims pursuant to 28 USC § 1331, and supplemental jurisdiction over plaintiffs' state law claims under 28 USC § 1367(a). All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c).

Home Depot filed motions for summary judgment against the claims of plaintiffs Bahri (docket # 109), Florea (docket # 105), Nelson (docket # 101), Galas (docket # 113), Espen (docket # 150), and Roberge (docket # 154). On October 7, 2002, this court ruled on all of the above motions. *See* Order (docket # 201). This Opinion provides the reasons for those rulings.

## ANALYSIS

### I. Factual Background

Home Depot operates a number of home improvement stores in Oregon. This case involves allegations of age and gender discrimination and retaliation at the Tigard store. Four of the plaintiffs (Bahri, Florea, Nelson, and Galas) worked in the Kitchen and Bath ("K & B") Department in the Tigard store between August 1997 (Bahri Aff., ¶ 4) and December 2000 (Plaintiffs' Facts,[6] ¶ D1 (Galas termination)).

---

In addition, plaintiffs have filed two affidavits to which are attached a series of exhibits. Those affidavits are the Affidavit of Zan Tewksbury in Opposition to Defendant's Motions for Summary Judgment Against Claims of Bahri, Florea, Galas, and Nelson (docket # 121), attaching three volumes of exhibits numbered 1–75 and the Affidavit of Tom Steenson in Support of Plaintiffs' Opposition to Defendant's Motions for Summary Judgment Against Claims of Roberge and Espen (docket # 175), attaching one volume of exhibits numbered 101–207. Citations to those exhibits are simply to the plaintiffs' exhibit number.

3. Oregon's laws prohibiting discrimination on the basis of age and gender were recodified in 2001. *See* ORS 659A.029–.030. However, in accordance with the references used by the parties, this court will refer to the former section numbers.

4. Espen seeks to add claims premised upon a constructive wrongful discharge in a Fourth Amended Complaint (docket # 247). This Opinion addresses only those claims alleged in the Third Amended Complaint.

5. Espen went on medical leave on April 1, 2001 (Espen Aff., ¶ 13) and resigned for "personal reasons" on November 8, 2001 (Hanchett Aff. (Espen), ¶ 9, Ex. H), and Toles, who apparently no longer works for Home Depot, lives in Waterville, Maine.

6. Plaintiffs' Consolidated Concise Statement of Material Facts and Other Opposition to Defendant's Motions for Summary Judgment Against Claims of Bahri, Florea, Galas, and Nelson (docket # 122) is referred to herein as "Plaintiffs' Facts." Home Depot has submitted six separate fact statements, which are identified by noting the plaintiff they concern, *e.g.* Defendant's Facts (Nelson) refers to the fact statement regarding Nelson's claims.

Espen worked at the Tigard store from March 1998 to April 2001, and was a sales associate in the Millworks department for all but the first five weeks of that time. Roberge worked in a variety of departments at the Tigard store between March 1997 and August 2000. Lundervold began working for Home Depot on May 23, 1994, and became the Store Manager of the Tigard store on July 1, 1999.

The parties have submitted detailed factual statements. However, plaintiffs have opposed virtually every fact in Home Depot's fact statements. Additionally, Home Depot in turn opposed and moved to strike virtually every statement in the affidavits supporting plaintiffs' fact statements, and plaintiffs moved to strike the Lundervold's affidavit[7] filed on August 1, 2002. In previous Orders, this court ruled on the motions to strike portions of the affidavits of Bahri, Florea, Nelson, Galas, Robert Cozad, Don Gibson, Leo Jerman Roberge, and Espen, and allowed plaintiffs to file a surreply concerning the statistical evidence contained in the Lundervold Reply Affidavit. Opinions and Orders dated August 27, 2002 (docket # 158) and October 7, 2002 (docket # 200).

Because each plaintiff relies on evidence from other plaintiffs to support his or her claims, this court addresses that evidence below as it relates to each plaintiff's claims.

## II. Summary Judgment Standard

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct.

2548, 91 L.Ed.2d 265 (1986). Once the moving party does so, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324, 106 S.Ct. 2548. The court does "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City,* 180 F.3d 1047, 1054 (9th Cir.1999). A " *'scintilla* of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material fact. *United·Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 631–32 (9th Cir.1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id* at 631 (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630–31. However, when the non-moving party's claims are factually *"implausible,* that party must come forward with more persuasive evidence than would otherwise be [required] . . . ." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988) (emphasis in original) (citation omitted). The Ninth Circuit has found, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

---

**7.** The Affidavit of Scott Lundervold in Support of Defendant's Reply Memorandum in Support of Defendant's Motions for Summary Judgment Against Bahri, Florea, Galas, and Nelson is referred to as the "Lundervold Reply Aff." and citations are to the paragraph number of that document.

## III. Age Discrimination Claim by all Plaintiffs (First Claim)

Each of the seven plaintiffs alleges a claim for age discrimination in violation of the ADEA and ORS Chapter 659. For the reasons that follow, each of Home Depot's motions for summary judgment against the First Claim are denied.

### A. Legal Standard

#### 1. Order of Proof

The ADEA makes it unlawful for an employer to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age. 29 USC § 623(a)(1). Protection under the ADEA extends to all individuals who are at least 40 years old. 29 USC § 631(a). Oregon law also prohibits age discrimination, but extends protection to individuals over the age of 18. ORS 659.030(1)(a) & (b).

The Ninth Circuit analyzes ADEA cases using the framework articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141–42, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (collecting cases from other circuits); Nidds v. Schindler Elevator Corp., 113 F.3d 912, 917 (9th Cir.1996), cert denied, 522 U.S. 950, 118 S.Ct. 369, 139 L.Ed.2d 287 (1997). Under the three-part methodology articulated in McDonnell Douglas, the plaintiff must first establish a prima facie case of discrimination. The burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff is then afforded an opportunity to demonstrate that the employer's proffered reason was pretextual, "either directly by persuading the court that a discriminatory reason more likely motivated the employer

or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("Burdine").

Although Oregon courts analyzing claims under ORS Chapter 659 have rejected the McDonnell Douglas burden-shifting approach, Callan v. Confederation of Oregon Sch. Adm., 79 Or.App. 73, 717 P.2d 1252 (1986), that approach nonetheless applies to the assessment of Oregon employment discrimination claims brought in federal court. Snead v. Metropolitan Prop. & Cas. Ins. Co., 237 F.3d 1080 (9th Cir.), cert denied, 534 U.S. 888, 122 S.Ct. 201, 151 L.Ed.2d 142 (2001); Williams v. Federal Express Corp., 211 F Supp 2d 1257, 1261 (D.Or.2002).

#### 2. Prima Facie Case

Numerous cases require a plaintiff to establish a prima facie case of disparate treatment discrimination by showing that he or she: (1) belonged to a protected class; (2) was satisfactorily performing his or her job or was qualified for hire; (3) was terminated, rejected for employment, or otherwise subjected to an adverse employment action; (4) which took place under circumstances giving rise to an inference of unlawful discrimination. See, e.g., O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312–13, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996); McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817; Chuang v. University of Calif. Davis, 225 F.3d 1115, 1123 (9th Cir.2000); Nidds, 113 F.3d at 917; Washington v. Garrett, 10 F.3d 1421, 1433–34 (9th Cir.1993). Oregon's standard for establishing a prima facie case of discrimination is identical to that under federal law. Henderson v. Jantzen, Inc., 79 Or.App. 654, 657, 719

P.2d 1322, 1324, *rev denied,* 302 Or. 35, 726 P.2d 934 (1986).

### a. *Satisfactory Job Performance*

The parties in this case have a fundamental disagreement over what is required to prove the second element of a *prima facie* case of disparate treatment discrimination. Home Depot insists that several of the plaintiffs were not satisfactorily performing their jobs based on documentary evidence of verbal and written reprimands and performance evaluations. Based on that evidence, Home Depot seeks summary judgment against the disparate treatment claims of several plaintiffs. The unspoken premise of this argument is that in order to establish a *prima facie* case, plaintiffs must establish that they were satisfactorily performing their jobs *at all times.*

■ While this court recognizes that the Ninth Circuit includes proof of satisfactory job performance as the second *prima facie* element, such proof need not include a flawless personnel file at all times during employment. It would be fundamentally unfair to require plaintiffs to show that their employment files were devoid of negative reviews and write ups *after* illegal discrimination was interjected into their workplace particularly where, as here, plaintiffs allege that the discrimination manifested itself in unjustified warnings and unjustifiably low performance evaluation rankings. In short, the second element of the *prima facie* case makes sense only when it is limited to the time period *prior* to the introduction of the alleged unlawful discrimination.

Innumerable cases reiterate that the burden of establishing a *prima facie* case "is not onerous," *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089; *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420 n. 1 (9th Cir.1990), and at the summary judgment stage requires only "minimal" proof which "does not even

need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir.1994), citing *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir.1987), *cert denied,* 498 U.S. 939, 111 S.Ct. 345, 112 L.Ed.2d 309 (1990). Legions of cases also indicate that the elements of a *prima facie* case mut be adapted to fit the particular case. *See, e.g., Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089 n. 6; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817 n. 13 (noting that *prima facie* proof required may vary in differing factual situations); *Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30,* 694 F.2d 531, 550 (9th Cir.1982) ("We have repeatedly emphasized that proof of the four *McDonnell Douglas* criteria is not the only way to establish a *prima facie* case of disparate treatment, and that the *McDonnell Douglas* approach is to be applied flexibly"). Requiring a plaintiff to prove that he or she was free from job criticisms when allegedly being subjected to unlawful discrimination in the form of unjustified job criticism defies logic and flies in the face of this "minimal" and "flexible" burden.

Moreover, the Supreme Court observed six years ago that "[a]s the very name '*prima facie* case' suggests, there must be at least a logical connection between each element of the *prima facie* case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.'" *O'Connor,* 517 U.S. at 311–12, 116 S.Ct. 1307, quoting *Burdine,* 450 U.S. at 254, 101 S.Ct. 1089 n. 7. The Court emphasized that the relevant inquiry under the ADEA is whether the employee has suffered adverse action "*because of his age.*" *Id* at 312, 101 S.Ct. 1089 (emphasis in original). Because "there can be no greater inference of age discrimination (as opposed to '40 or over' discrimination) when a 40–year–old is replaced by a 39–year–old than when a 56–

year–old is replaced by a 40–year–old," the Court modified the *prima facie* case for an ADEA plaintiff by eliminating the requirement that he or she be outside the protected class. *Id.* The same logic exemplified in *O'Connor* mandates that the second element of the *prima facie* case be modified to apply to that period *before* plaintiff alleges that he or she was subjected to unlawful discrimination.

Thus, this court declines to accept Home Depot's suggestion that proof of satisfactory job performance at all times is a necessary element of plaintiff's *prima facie* case. Instead, the plaintiff simply must establish satisfactory job performance *prior to the introduction of the allegedly unlawful discrimination.*

### b. *Adverse Employment Action*

The Ninth Circuit has made clear "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks v. City of San Mateo,* 229 F.3d 917, 928 (9th Cir.2000), citing *Ray v. Henderson,* 217 F.3d 1234, 1243 (9th Cir.2000). Examples of sufficiently "adverse" employment actions include "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion." *Id.* (footnote and citations omitted). In contrast, "declining to hold a job open for an employee and badmouthing an employee outside the job reference context do not constitute adverse employment actions." *Id.* at 928–29 (footnote and citations omitted). Similarly, "ostracism suffered at the hands of coworkers cannot constitute an adverse employment action." *Id.* at 929, citing *Strother v. Southern Cal. Permanente Med. Group,* 79 F.3d 859, 869 (9th Cir.1996).

### c. *Inference of Discrimination*

An inference of discrimination can be established either by showing that the employer had a continuing need for the plaintiff's skills and services in that his various duties were still being performed, or by showing that substantially younger employees were treated more favorably. *O'Connor,* 517 U.S. at 312–13, 116 S.Ct. 1307; *Nidds,* 113 F.3d at 917.

■ Where the adverse employment action is a termination, a plaintiff may meet this requirement by showing that the employer had a continuing need for plaintiff's skills and services and plaintiff's various duties were still being performed by others after plaintiff's discharge, *Rose,* 902 F.2d at 1421, or by showing that the plaintiff was replaced by an individual outside the protected class with equal or inferior qualifications. *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1281 (9th Cir.2000); *Jones v. Los Angeles Cmty. Coll. Dist.,* 702 F.2d 203, 205 (9th Cir.1983).

### 3. *Rebutting Employer's Proffer of Nondiscriminatory Reason*

"Establishment of a *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Wallis,* 26 F.3d at 889. Once plaintiff has established a *prima facie* case, the burden of production shifts to the defendant to rebut the presumption of discrimination by articulating some permissible reason for the adverse action. *Id.* "Once the defendant fulfills this burden of production by offering a legitimate, nondiscriminatory reason for its employment decision, the ... presumption of unlawful discrimination 'simply drops out of the picture.'" *Id.,* citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). At that point, a plaintiff can avoid summary judgment simply by producing evidence which raises a

genuine issue of material fact regarding the truth of the employer's proffered reasons:

> As the Supreme Court recently reaffirmed, a disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons. . . . While the plaintiff always retains the burden of persuasion, . . . he does not necessarily have to introduce "additional, independent evidence of discrimination" at the pretext stage.

*Chuang,* 225 F.3d at 1127, quoting *Reeves,* 530 U.S. at 149, 120 S.Ct. 2097, and citing *St. Mary's Honor Ctr.,* 509 U.S. at 511, 113 S.Ct. 2742 (additional citations omitted).

Specifically, the plaintiff simply must produce enough evidence to allow a reasonable factfinder to conclude either that: (a) a discriminatory reason more likely motivated the employer or (2) the employer's proffered explanation is unworthy of credence. *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089; *Nidds,* 113 F.3d at 918. If the plaintiff offers direct evidence of discriminatory motive, a triable issue on the actual motivation is created "even if the evidence is not substantial." *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998). The plaintiff may also offer circumstantial evidence that tends to show that the proffered motive is a pretext because it is inconsistent or unbelievable. *Id* at 1222. The Supreme Court has clarified that "because a *prima facie* case and sufficient evidence to reject the employer's explanation may permit a finding of liability, [a court may not proceed] from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Reeves,* 530 U.S. at 149, 120 S.Ct. 2097.

## B. Kitchen Designers (Nelson, Florea, Bahri, & Galas)

### 1. K & B Department

The K & B Department at the Tigard store employs a number of Sales Associates, some of whom are assigned to "aisle sales" and some of whom are assigned as Kitchen Designers. *See* Plaintiffs' Facts, ¶¶ P1–P6. When Lundervold became the Store Manager of the Tigard store on July 1, 1999, Home Depot employed Bahri, Florea, Galas, and Nelson as Kitchen Designers in the K & B Department. Lundervold Reply Aff., ¶¶ 1, 4–5. All were age 40 or over.[8] Bahri had worked in that department since August 1997, Galas since January 1999, Florea since February 1999, and Nelson since June 1999. Plaintiffs' Facts, ¶¶ B4, C2, D2, E2.

Brownlie was employed as one of the Assistant Store Managers at the Tigard store. Shortly after Lundervold became the Store Manager, he assigned Brownlie to be the Assistant Store Manager over the K & B Department. Others supervised the K & B Department as well, including Tony Gift ("Gift"), Amy Craven ("Craven"), and Eric Gershoffer ("Gershoffer"). Defendant's Facts (Nelson), ¶ 2.

Home Depot terminated Florea on January 10, 2000 (at age 53), Nelson on February 10, 2000 (at age 50), Bahri on April 6, 2000 (at age 45),[9] and Galas on Decem-

---

**8.** Bahri was then age 45 (YOB 1954); Florea was then age 53 (YOB 1946); Galas was then age 40 (YOB 1958); and Nelson was then age 49 (YOB 1949).

**9.** As discussed in more detail below, Home Depot disputes that it affirmatively "terminated" Bahri or that Bahri was "constructively" terminated. Instead, Home Depot argues that Bahri voluntarily abandoned his job, which ultimately required Home Depot to process his termination as a job abandonment.

ber 3, 2000 (at age 41). Brownlie was eventually transferred out of the Tigard store and then back into the Tigard store, where he was demoted to a sales associate position due to the complaints by associates and documented performance issues. Sanford Depo., pp. 92–93.

### a. *Nelson*

Nelson was first employed by Home Depot on or about June 12, 1999 as a Sales Associate assigned to be a Kitchen Designer in the K & B Department at the Tigard store. Prior to that employment, Nelson had 25 years experience in the field of kitchen design, including working as a Design Master at another company. Nelson Aff., ¶ 2. She was a Certified Kitchen Designer ("CKD") through the National Kitchen and Bath Association ("NKBA"), of which Home Depot is a member. *Id.*

Nelson's first few months of employment passed without incident. Nelson believes that prior to Lundervold becoming the Store Manager, she was treated fairly, given fair performance evaluations, and scheduled for the training necessary to succeed in her job. *Id.,* ¶ 4. Once Lundervold was hired in July 1999, Nelson's training on the 20/20 computerized design system was cancelled; she was micromanaged, unfairly counseled, disciplined, and was required to sign a sales quota that no one else was required to sign. *Id.*

Brownlie repeatedly called Nelson "missy," and referred to female employees as his "girls." *Id.,* ¶ 6(a). Brownlie also yelled in Nelson's face; ordered her into his office for no reason; belittled her experience in design, ideas, and suggestions; and repeatedly made unwelcome comments about her style of dress, hair, shoes, and alleged relationship with Galas. *Id.,* ¶ 6(a)-(c). Nelson continuously complained about the harassment. After complaining, she was falsely accused of having an excessive number of mispunches on her time cards. *Id.,* ¶ 10.

Between October and December 1999, Nelson received verbal and written warnings for not wearing her apron, missing punches on the time clock, and making personal use of the company telephone. Hanchett Aff. (Nelson), Ex. A, pp. 19–22. In December 1999, Nelson received an overall rating of a 2 on her performance evaluation. *Id.* at 23–27. She received additional written warnings on January 27 and February 5, 2000, and was terminated on February 10, 2000 for "Attendance / Punctuality" problems. *Id.* at 28–31.

### b. *Florea*

Florea began working as a Kitchen Designer in the K & B Department at the Tigard store on February 8, 1999. Florea Aff., ¶ 2. Prior to his employment with Home Depot, he had 30 years of experience in the construction field, with an emphasis on kitchen design work, including retail experience and running his own remodeling company. *Id.*

At the time he was hired, Home Depot agreed that Florea would be able to periodically take time off with advance notice to the Department Head (Hanchett Aff. (Florea), Ex. A, p. 23), including two weeks off in January 2000 to travel to South Africa. Florea Depo., pp. 100, 104. When Florea initially began his job with Home Depot, he worked full time. However, some time in 1999, he cut his hours back to 25 or 30 per week. He reported to Department Heads Gershoffer or Gift and his hours were scheduled by Hillary Thomas. His duties included customer follow-up and dealing with vendors.

On July 5, 1999, Gift completed a performance appraisal regarding Florea. Plaintiffs' Ex. 31. His rankings in that performance appraisal were all 4 and 5, and his overall ranking was 4, indicating that he

had completed about 75% of his Development Plan.[10]

After Lundervold became the Store Manager, Florea was micromanaged, had his performance unfairly criticized, received unjustified counselings and discipline, and received a lower performance review which reduced his merit-based pay raise; he also was falsely accused of bad-mouthing Home Depot products, talking about his religion, and violating company policy by talking about his wages. Florea Aff., ¶¶ 9–12.

On September 16, 1999, Florea received two written warnings, one for discussing religion on the sales floor, and one for making disrespectful comments about the products of a Home Depot vendor, American Woodmark. Hanchett Aff. (Florea), Ex. A, pp. 22, 29. However, shortly after Florea began working at Home Depot, Gershoffer told the entire K & B Department not to sell the products of American Woodmart. Florea Depo., p. 85.

In late December 1999,[11] Florea complained to Lundervold about Nelson being harassed and discriminated against. Florea Aff., ¶ 6. Lundervold responded that he was "getting rid of that overpaid cunt." *Id.*

Brownlie, Gershoffer and all the other employees in the K & B Department were aware that Florea planned to take two weeks off in January 2000 to travel to South Africa. Florea Depo., p. 104. However, on December 27, 1999, Lundervold told him he could not take vacation time in January 2000 and Florea responded by losing his temper. Florea Aff., ¶ 7; Plaintiffs' Ex. 37.

On December 29, 1999,[12] Craven and Gershoffer completed another performance appraisal of Florea. The bulk of the rankings in that performance appraisal were 2 and 3 and the overall ranking was 3, indicating that he had completed about 50% of his Development Plan.

In January 2000, Bahri was approached by management seeking negative information on Florea's job performance. Bahri Aff., ¶ 5. Bahri was never approached by management for information on younger Home Depot employees. *Id.*

Home Depot terminated Florea on January 10, 2000, based on the verbal and written warnings he had received and complaints about his behavior from coworkers.

### c. *Bahri*

In January 1996, Bahri began working as a Sales Associate assigned to the Lumber Department at the Tigard store. Bahri Aff., ¶ 2. Prior to working for Home Depot, Bahri received a degree in Civil Engineering from the University of Texas, a Building Construction Certificate from the NR1 School of Building Construction, and design training from the Clackamas

10. Home Depot uses a performance appraisal ranking system with a scale from 1–5: 1=unacceptable performance (not meeting job expectations); 2=improvement needed (meets some, but does not consistently meet all job expectations); 3=solid performance (meets job expectations); 4=effective performance (meets all and exceeds some job expectations); and 5=exceptional performance (meets all and exceeds most job expectations).

11. Florea does not specify when he complained to Lundervold, other than to say that it was "[s]hortly before [his] termination."

Florea Aff., ¶ 6. This court will assume, in Florea's favor, that his complaint predated the denial of his vacation time and termination in January 2000.

12. Although this performance appraisal purports to have been "written" on December 23, 1999, it was not signed by Gershoffer and given to Florea until December 29, 1999, two days after Florea lost his temper with Lundervold. Plaintiffs' Ex. 32, p. 5. This court will give Florea the benefit of the inference that the performance appraisal followed the December 27, 1999 incident.

Drafting School. In his previous employment, he had good working relationships with his coworkers, supervisors, and customers, and received good performance reviews and merit-based pay raises. *Id.*

Around August 1997, Bahri was transferred to a Kitchen Designer position in the K & B Department. In 1998, Bahri informed then Store Manager, Joe Bonaventura ("Bonaventura"), that he wanted to become a CKD. Bahri Depo., p. 36. Bonaventura approved Bahri's reimbursement request for the materials, books, and manual necessary to earn the certificate. Plaintiffs' Ex. 29.

Bahri contends that for the three and a half year prior to Lundervold's arrival at the Tigard store, he had been doing well at Home Depot, received strong performance evaluations, enjoyed merit-based pay raises, and was not disciplined. Shortly after Lundervold arrived, however, Bahri's design responsibilities were reduced and Brownlie was assigned to be the Assistant Store Manager of the K & B Department. Although Bahri's design responsibilities were restored when he complained, Bahri contends that his performance was micromanaged and that he was criticized for minor things that previously had gone unmentioned, such as not punching out for lunch. Bahri Depo., pp. 97–98.

Bahri repeatedly complained to upper management about being harassed and discriminated against. Bahri Aff., ¶ 7. By September 1999, Bahri began looking into a transfer to Home Depot's Clackamas store. Bahri Depo., p. 62. He sought that transfer in order to escape from Lundervold's discriminatory treatment and retaliation. Bahri Aff., ¶ 4. He continued to seek a transfer up until his termination. At some point, Bahri contacted Steven Sanford ("Sanford"), one of five Divisional Human Resources Managers in Home Depot's Northwest Division, and told him he wanted to be transferred out of the Tigard store. Sanford Depo., pp. 6, 44.

Bahri testified that Lundervold made it "pretty clear" that Home Depot was intent on cutting costs by replacing higher-paid employees with younger, less costly workers. Bahri Depo., p. 89. Bahri bases this assessment on actions taken and comments made by Brownlie at Lundervold's direction. *Id.* at 89–90. During Bahri's annual performance review in December 1999, Brownlie told Bahri there was "no future" for Bahri at Home Depot in terms of making more money because Bahri had been there four years and had not once been interviewed for promotion. *Id.* at 92. He also told Bahri that Home Depot could hire two employees for what it was paying Bahri. *Id.* at 90. Consistent with this theme, Bahri also asserts that he received a lesser raise than he had received from Lundervold's predecessors.

Some time in the summer of 1999, Bahri approached Lundervold about taking the CKD examination and got a "positive" response. *Id.* at 40. The next CKD examination was scheduled for March 25, 2000. In mid-February 2000, Bahri learned that there was a local Home Depot-supported training program for the CKD examination. By that time, however, he was only able to take two of the approximately ten courses. *Id.* at 41–50. Shortly thereafter, in late February 2000, he spoke to Lundervold about the examination and Lundervold told him he could not sit for the examination because he had not taken Home Depot's local training program. *Id.* at 41. Bahri responded that he intended to take his two days off and take the examination. *Id.* at 60.

Bahri spoke with Fitzgibbon and Midgley who agreed that he should have some time off prior to the examination to prepare. They approved a schedule change which gave Bahri four days off from

March 22–25, 2000. Both approved the time off [13] and made necessary scheduling changes. However, Bahri would come back into work the next day and discover the schedule was changed back. Bahri Depo., pp. 65–66.

On March 25, 2000, Bahri traveled to Seattle, Washington, and took the CKD examination. Bahri Depo., p. 61. The following day, he reported to work at Home Depot, but was sent home for two days as a purported "layoff." *Id.* at 91. The next day, Lundervold called and told Bahri that he was not going to be allowed to transfer to another store because he had taken two extra days off for the CKD examination and that his reimbursement for expenses request was denied. *Id.* at 64, 67; Plaintiffs' Ex. 30, p. 1. Sanford testified that Lundervold told him that he would not approve the transfer to another store until he and Bahri had resolved some concerns Lundervold had about CKD training. Sanford Depo., p. 44.

On March 31, 2000, Lundervold sent Bahri a letter stating that his request for a transfer to another store and his request for reimbursement of expenses for the CKD examination were denied. Plaintiffs' Ex. 30. The letter also advised Bahri that he was "still listed as an active associate" and that if he "wish[ed] to retain [his] position," he should report to work on April 6, 2000, and that failure to do so would "be considered job abandonment and [that his] employment [would] then be terminated." *Id.*

Bahri never returned to work at Home Depot.

### d. *Galas*

Galas began working for Home Depot in January 1999. Galas had over 15 years of experience in the field of architectural home design, including designing and installing kitchens on a commission basis for Home Depot off and on between 1977 and 1995, and training and education in the field of architecture. Galas Aff., ¶ 2. Galas worked in the Plumbing Department for approximately a month and a half, and then moved to the K & B Department, where he was assigned as a Kitchen Designer. *Id.*

Galas' "New Associate Review," dated April 29, 1999, indicated a "solid performance" in all categories, including customer cultivation, willingness to learn, showing work commitment, and getting along with others. Plaintiffs' Ex. 33. His July 5, 1999 Performance Appraisal, completed by Gift and Craven, rated Galas's overall performance as 3, and, with one exception for the category of "striving to be the best," rated Galas' performance in all other specific categories as 3 or 4. Plaintiffs' Ex. 34.

Prior to Lundervold becoming the Store Manager, Galas believes that he was treated fairly. *Id.* ¶ 3. In addition to his solid performance reviews, was allowed the freedom to do his job, was not micromanaged and unfairly criticized, and was not disciplined. *Id.* After Lundervold arrived, Galas believes he was treated differently and discriminated against on the basis of his age by being micromanaged, having his performance unfairly criticized, receiving unjust counselings and discipline, and being falsely accused of poor customer service, altercations with coworkers, and trying to funnel customers away from Home Depot. *Id.*

Galas received warnings or counselings on: (1) July 4, 1999 (written warning) for tardiness, alleging that Galas was scheduled to begin working at 8:30 a.m., but did not appear until 10:15 a.m.; (2) October 11,

---

**13.** Home Depot disputes any preapproval of either the time off or the transfer to another store. Defendant's Facts (Bahri), ¶¶ 5–18.

Since Bahri disputes Home Depot's facts, this court assumes this disputed issue in Bahri's favor.

1999 (verbal warning) for working unauthorized overtime; (3) October 18, 1999 (written warning) for not working a scheduled shift; and (4) November 8, 1999 (counseling) for working unauthorized overtime and not working a scheduled shift. O'Connor Aff. (Galas), Ex. A, pp. 36–39.

Galas' next Performance Appraisal dated December 19, 1999, still rated his overall performance as 3, but rated his performance in the areas of satisfying a customer, and striving to be the best, being a team player as 2, and decreased his rating from 4 to 3 in the categories of sharing information, stress tolerance, and active listening. Plaintiffs' Ex. 34; *cf.* O'Connor Aff. (Galas), Ex. A, pp. 31–35.

In 1999 and early 2000, Galas complained about sex discrimination against Nelson and other female employees by Brownlie, including Brownlie's constant telling of inappropriate sexual jokes in the workplace, singling Nelson out for counseling and discipline, and terminating Nelson for false and pretextual reasons. Galas Aff., ¶ 6. After those complaints, Galas was further disciplined and harassed about his relationship with Nelson. *Id.*, ¶ 7. His performance rankings decreased at his next review, and as a result, he received a lesser merit-based pay increase. *Id.*

Galas received additional warnings or counselings on: (1) March 9, 2000 (verbal and written warnings) for tardiness, claiming that between March 1 and 5, 2000, Galas was late every day; (2) April 5, 2000 (Performance Notice) for a pattern of tardiness; (3) April 8, 2000 (counseling) for poor customer service; and (4) June 5, 2000 (written warning) for missing a mandatory meeting. O'Connor Aff. (Galas), Ex. A, pp. 40–43. Approximately three weeks after the last of these warnings, Galas received a Performance Appraisal dated June 20, 2000, which ranked his overall performance at 2, and decreased his rankings in the areas of active listening and judgment from 3 to 2. O'Connor Aff. (Galas), Ex. A, pp. 31–35; *cf.* Ex. B, pp. 1–5.

The next series of warnings and counselings documented by Home Depot include a(n): (1) August 25, 2000 counseling for poor customer service; (2) October 9, 2000 Performance Notice for failure to correct attendance and punctuality problems; (3) November 6, 2000 Performance Notice and verbal warning for poor customer service; and (4) November 26, 2000 written complaints by coworkers for responding inappropriately to a coworker's question. O'Connor Aff. (Galas), Ex. A, pp. 28–30, 44, Ex. C.

After Florea, Nelson, and Bahri were terminated, Galas believed he was being deliberately targeted for termination. Despite the stress imposed by that realization, he remained among the top three for sales in the district throughout the remainder of his employment. Galas Aff., ¶ 8. Galas flatly denies Home Depot's accusations that he lied about his qualifications when applying to Home Depot and the CKD examination, tried to funnel customers away from Home Depot, had altercations with coworkers, and was late, had more time clock violations, or made more mistakes than any other Home Depot employee. *Id.*, ¶¶ 9, 11–12, 16.

### e. *Evidence Regarding Other Home Depot Employees*

Apart from the named plaintiffs, other Home Depot employees who worked at the Tigard store at the same time also complained about treatment by Brownlie.

Lauritz Pillers ("Pillers") was first employed by Home Depot in March 1994 as a clinic instructor at the Tigard store. In that role, he ran clinic classes for Home Depot employees and customers. He often prepared class teaching materials at

home, using old equipment and salvaged materials from Home Depot which he had permission from management to take home for this purpose. Pillers Depo., pp. 43, 97–98. After Lundervold became the Store Manager, Pillers initially received excellent performance reviews, consistent with his previous reviews. Plaintiffs' Exs. 41–42. However, Home Depot management, including Lundervold, repeatedly asked Pillers about when he was going to retire. *Id.* at 6–7, 10–13.

In November 2000, Pillers refused to disclose his retirement date to Lundervold. Pillers Depo., pp. 6–7. Prior to his performance review on March 23, 2001, and in response to an Assistant Store Manager's question about when he was going to retire, Pillers again refused to disclose his retirement date. *Id.* at 6. Later that same day, Pillers was investigated and told he was terminated for alleged "theft." Plaintiffs' Ex. 44. Pillers maintains that the items he was accused of stealing were taken for teaching purposes with the knowledge and consent of management. Pillers Depo., pp. 43, 97–98.

Marietta Durst ("Durst"), who worked in the Paint Department at the Tigard store, was treated differently than her younger coworkers and asserts that Brownlie (who also supervised the Paint Department) harassed her on the basis of her age and gender. Durst Aff. ¶ 2. In July 1999, Durst telephoned Home Depot's "Alertline" and complained about the treatment she was being subjected to by Brownlie. *Id.* ¶ 3; Plaintiffs' Ex. 54; Sanford Depo., p. 80. Because Brownlie's harassment did not stop, Durst resigned in February 2000. Durst Aff. ¶ 1.

Don Gibson ("Gibson") worked as a Sales Associate at the Tigard store between March 18, 1998, and August 20, 1999. During that time, he worked with Nelson, Florea, Bahri, Roberge, and Toles on a regular basis. Gibson Aff., ¶ 2. Gibson was terminated on August 20, 1999, at the approximate age of 50.[14] *Id.*, ¶ 8. In late September 1999, Gibson placed a call to the Home Depot "Alertline" and sent a written complaint to Home Depot's headquarters in Atlanta, Georgia. Sanford Depo., pp. 80–81. During the course of Sanford's investigation of those complaints, Gibson told Sanford that he believed that he had been subjected to repeated instances of abuse and harassment by Brownlie. Gibson either told Sanford, or stated in his written complaint, that the abuse and harassment was because of Gibson's age. *Id.* at 82. Sanford is sure he probably told Lundervold about Gibson's complaints. *Id.* at 83.

### 2. *Prima Facie Case*

#### a. *Adverse Employment Action*

Home Depot argues that Bahri suffered no adverse employment action because he was not discharged, but instead abandoned his job. Bahri counters that he did not abandon his job, but was constructively discharged.

 A constructive discharge "occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.' " *Brooks,* 229 F.3d at 930, quoting *Turner v. Anheuser–Busch, Inc.,* 7 Cal.4th 1238, 1246, 32 Cal.Rptr.2d 223, 876 P.2d 1022, 1026 (1994) (summarizing Ninth Circuit cases) (remaining citations omit-

---

14. Gibson does not state his date of birth, but was 53 years old when he signed his affidavit on July 18, 2002.

ted). A plaintiff seeking to pursue such a claim must show that he or she quit the job "under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable." *Draper v. Coeur Rochester, Inc.,* 147 F.3d 1104, 1110 (9th Cir.1998), citing *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir.1994), *cert denied,* 513 U.S. 1082, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995). Such a claim "usually results from a series of discriminatory actions on the part of the employer that are in the nature of a continuing violation. ... In such cases the individual has simply had enough; [he or] she can't take it anymore." *Id.* Constructive discharge may also be found where an employee reasonably believes that his termination is inevitable. *See Stephens v. C.I.T. Group/Equip. Fin.,* 955 F.2d 1023, 1027–28 (5th Cir.1992).

Generally, "a single isolated incident is insufficient as a matter of law to support a finding of constructive discharge." *Sanchez v. City of Santa Ana,* 915 F.2d 424, 431 (9th Cir.1990), citing *Watson v. Nationwide Ins. Co.,* 823 F.2d 360, 361 (9th Cir.1987). However, a plaintiff may prove a constructive discharge by showing " 'aggravating factors' such as a 'continuous pattern of discriminatory treatment.' " *Satterwhite v. Smith,* 744 F.2d 1380, 1382 (9th Cir.1984), quoting *Clark v. Marsh,* 665 F.2d 1168, 1174 (D.C.Cir.1981); *see also Sanchez,* 915 F.2d at 431 (citing *Satterwhite* with approval); *Nolan v. Cleland,* 686 F.2d 806, 813 (9th Cir.1982) (continuing discrimination provides an aggravated situation sufficient to uphold a constructive discharge finding). The Ninth Circuit has found the requisite "aggravating factors" and "upheld factual findings of constructive discharge when the plaintiff was subjected to incidents of differential treatment over a period of months or years." *Watson,* 823 F.2d at 361 (citations omitted). For example, "in *Nolan,* [the Ninth Circuit] held that a showing of four incidents of differential treatment over a period of two years was sufficient to create a genuine issue of fact for trial." *Id.*

■ Home Depot claims Bahri's failure to return to work was unreasonable. First, it contends that Bahri only needed to take time off for the CKD examination because he was unprepared and that he could have taken the next examination. Second, it contends that Bahri's transfer was not denied but was simply delayed because Bahri had taken time off without authorization. And, third, it contends that there is no objective evidence that Bahri deserved more of a raise than he received. Bahri counters that prior to Lundervold becoming the Store Manager, he was treated fairly, received strong performance reviews, was not disciplined, and was given merit-based pay raises. After Lundervold became the Store Manager, he reassigned Bahri to aisle sales (but then cancelled the reassignment upon Bahri's challenge), gave him a smaller pay raise than he deserved, revoked his transfer to another store, denied him training, and denied him both time off and vacation time in order to study for and take the CKD examination. Bahri complained to at least two Assistant Store Managers and to Sanford at Home Depot's District Office. Moreover, by the time Bahri and Lundervold locked horns over Bahri taking the CKD examination, Florea and Nelson had already been terminated. In addition, Bahri had been asked to provide negative information about Florea's job performance.

While one of these incidents in isolation may not be enough to support a constructive discharge claim, when considered together, they could lead a factfinder to conclude that a reasonable person would conclude that returning to work would be an act of futility because Lundervold had already decided to fire Bahri.

Thus, Home Depot's request for summary judgment against Bahri's age discrimination claim on the ground that Bahri was not discharged is denied.

### b. *Satisfactory Job Performance*

■ As discussed above, the second element of a *prima facie* case requires that plaintiffs show that they were satisfactorily performing their jobs prior to the alleged introduction of discrimination into their workplace. The K & B Department plaintiffs easily satisfy this burden. The New Associate Reviews and/or Performance Appraisals completed prior to or within a few days after Lundervold's arrival at the Tigard store uniformly rank the K & B Department plaintiffs as "solid" performers who were meeting their job expectations. *See, e.g.*, Hanchett Aff. (Nelson), Ex. A, pp. 17–18 (New Associate Review regarding Nelson dated August 12, 1999, rating her performance as "solid" in all categories); Plaintiffs' Ex. 31 (Performance Appraisal regarding Florea dated July 5, 1999, giving an overall ranking of 4); Plaintiffs' Exs. 24, 25, 27 (Performance Appraisals regarding Bahri dated May 9, 1997, January 5, 1998, and July 5, 1999, giving overall rankings of 4); and Plaintiffs' Exs. 33 and 34 (New Associate Review regarding Galas dated April 29, 1999, rating him as a "solid" performer in every category and Performance Appraisal of Galas dated July 5, 1999, giving overall ranking of 3). This is sufficient to satisfy the "minimal" evidentiary standard applicable to the *prima facie* case with respect to the element of satisfactory job performance.

### c. *Inference of Discrimination*

■ Home Depot also argues that all four plaintiffs who worked in the K & B Department have failed to present suffi-cient evidence to give rise to an inference of unlawful age discrimination. This court disagrees for four reasons.

First, plaintiffs have presented evidence that after Lundervold arrived at the Tigard store, a disproportionate number of older workers were terminated and replaced by younger, less experienced workers. Between February 8, 1998, and June 27, 1999, no Kitchen Designers in the K & B Department at the Tigard store were terminated, but between June 28, 1999, and December 31, 2000, at least three (or four including Bahri's constructive discharge) employees 40 years of age and older were terminated. Plaintiffs' Facts, ¶¶ P1–P4. This resulted in a considerably younger employee pool in that department.[15] *Id* at P5–P6.

In addition, plaintiffs point to several new K & B Department hires that followed on the heels of the terminations of Florea, Nelson, and Bahri. Plaintiffs' Facts, ¶ D14. Home Depot counters that Charles Phillips was hired in the K & B Department in September 1999, well *before* plaintiffs were terminated and that all of the employees identified by plaintiffs were hired to perform sales and aisle work and were not Kitchen Designers. However, the record reveals that there is some overlap in the job responsibilities of the K & B Department employees. Bahri Depo., p. 34 ("everyone in the department that does selling [does] some kitchen and bath designing"). Moreover, each of the employees identified by plaintiffs indeed appears to have been hired into the K & B Department after August 1, 1999, and appears to have been classified as being in Kitchen Design as of July 2, 2000. Plaintiffs' Exs. 35, 63. Plaintiffs assert that these employees had no significant prior kitchen design experience and were far less experienced

---

**15.** In August 1999 (Plaintiffs' Ex. 35) and from July through October 2000 (Plaintiffs' Ex. 63), the K & B Department had 6 full time and 1 part time Kitchen Designers.

than the K & B Department plaintiffs. Galas Aff., ¶ 15.

Second, plaintiffs have presented evidence of discriminatory comments supporting their theory that Home Depot management was intent on ousting older, higher paid employees in favor of younger, less expensive ones. Some time shortly after Lundervold became the Store Manager, Bahri heard him say that it "take[s] a certain designer to sell kitchen cabinet[s]." Bahri Depo., pp. 77–80. Bahri construed this comment as discriminatory. Following Brownlie's assignment to the K & B Department, he commented several times that he "could get two people for what we pay you" [or words to that effect]. Florea Depo., pp. 155–56. He made this same statement during Bahri's performance review, which appears to have taken place on December 19, 1999 (Plaintiffs' Ex. 28). Bahri Depo., pp. 89–90. He also made a similar comment to Florea. Florea Depo., pp. 177–78.

Third, a significant decrease in the performance evaluation ratings given to the K & B Department plaintiffs followed Lundervold's arrival at the Tigard store. Home Depot argues that this decrease simply indicates plaintiffs' lackluster and problematic performance. However, an equally plausible explanation is that, following Lundervold's arrival, the K & B Department plaintiffs were targeted for unjustified work criticisms and lowered performance evaluations because of their age.

Fourth, Espen and Roberge have presented evidence that older workers were viewed as ineligible for promotion. While this evidence does not directly show disparate treatment of the K & B Department plaintiffs, it does support plaintiffs' overall theory that older workers were not treated as favorably as their younger counterparts. One reasonable inference from the evidence is that, under Lundervold's guid-

ance, the corporate culture of Home Depot's Tigard store was to place older workers in a holding pattern at the lowest ranking job justifiable and then systematically terminate them after a course of unjustified reprimands and write ups.

### 3. *Legitimate Nondiscriminatory Reason*

■ Because plaintiffs have presented a *prima facie* case of age discrimination, the burden of production shifts to Home Depot to present evidence of legitimate, nondiscriminatory reasons for the employment actions it took. Home Depot has met that burden with respect to each of the K & B Department plaintiffs.

Home Depot has presented documentary evidence that Nelson was rude to customers, failed to wear her apron on the sales floor, made personal use of the company telephone, and exhibited repeated time and attendance problems including missed punches on the time clock, working off the clock, not being punctual and failing to take lunches as scheduled, and working unauthorized overtime. According to Home Depot, Nelson was warned, failed to improve, and was fired on February 10, 2000, for lack of punctuality and attendance problems.

According to Home Depot, Florea was a "troublemaker" who made inappropriate comments to vendors, managers, coworkers and customers. This argument is based upon Florea's alleged acts of: (1) "badmouthing" a Home Depot vendor's product line in August 1999; (2) violating Home Depot policy by discussing religion with coworkers and customers; (3) lying to his coworkers about his rate of pay; and (4) telling coworkers that Lundervold was unethical, slimy, and could not be trusted, and calling Lundervold profane names when he learned that his request for time off was denied. Home Depot terminated

Florea on January 10, 2000, based on previous verbal and written warnings and complaints from coworkers.

Home Depot contends that Bahri abandoned his job by failing to report to work. Failure to report to work constitutes a legitimate, nondiscriminatory reason for terminating an employee.

Finally, Galas was repeatedly and consistently warned about tardiness, working unauthorized overtime, not working scheduled shifts, making personal use of the company telephone, and providing poor customer service. Home Depot fired Galas after receiving three customer complaints about him on a single day.

In sum, Home Depot has proffered evidence which would support the conclusion that the K & B Department plaintiffs were disciplined and eventually terminated for repeated violations of Home Depot policies, complaints from coworkers and customers, time and attendance problems, and (in the case of Bahri) a flat-out refusal to come to work. Those reasons are legitimate and nondiscriminatory and justify the progressive discipline and eventual termination of plaintiffs.

### 4. *Rebuttal of Employer's Proffered Reasons (Pretext)*

Because Home Depot has proffered evidence of legitimate, nondiscriminatory reasons for terminating the K & B Department plaintiffs, the burden shifts back to plaintiffs to demonstrate that a discriminatory reason more likely motivated Home Depot or that the proffered reasons are unworthy of credence. Plaintiffs meet that burden for two reasons.

First, plaintiffs dispute and have offered explanations to counter every criticism by Home Depot as to their job performance issues. Nelson denies that she was rude to customers or provided poor service, explains that she decided to try and put customers first by serving them rather

than making them wait while she donned an apron, denies that she used the company telephone any more than any other employee and in fact was on a business call when disciplined, and denies that she had more time and attendance problems than any other employee. Nelson Aff., ¶¶ 7–9, 11. She also questions the accuracy of the time punching system at Home Depot. Nelson Depo., pp. 105–06.

Florea disputes Home Depot's characterization of the incident involving the vendor, asserts that he only discussed religion when others initiated such conversations and then stopped altogether when he was warned about it, and flatly denies "lying" about his wages to coworkers. Florea Aff., ¶ 12. Although Florea does not dispute that he had conflicts with Home Depot management, he asserts that those conflicts were caused by the discriminatory treatment he received and observed others receiving from Lundervold and Brownlie. Furthermore, Florea points out that his performance was fine until Lundervold was hired in July 1999. *Id.* ¶ 3.

As discussed above, Bahri has presented evidence sufficient to withstand Home Depot's request for summary judgment against his constructive discharge claim. Moreover, he contends that two Assistant Store Managers approved his four day absence from the Tigard store to prepare for and take the CKD examination for which Lundervold later disciplined him.

Finally, Galas flatly denies trying to funnel customers away from Home Depot, having altercations with coworkers, "lying" on his employment and/or CKD examination applications, taking personal phone calls on the company telephone, being late, having more time clock violations, or making more mistakes than any other K & B Department employee. Galas Aff., ¶ 9, 11–12, 16. Like Nelson, he contends that many of the criticisms were generated

944

from his attempts to put customers first. *Id.* ¶ 10. Although Home Depot argues that Galas' affidavit contradicts his prior deposition testimony, a review of the affidavit reveals that Galas simply elaborates on and explains his prior testimony.

When viewed in the light most favorable to the K & B Department plaintiffs, a reasonable factfinder could conclude that the bulk of Home Depot's alleged performance-based complaints had their genesis in the strained relationships caused by discriminatory treatment of the K & B Department plaintiffs. This type of factual dispute bars summary judgment against the discrimination claims of the K & B Department plaintiffs.

Furthermore, plaintiffs have presented evidence from which a reasonable factfinder could conclude that they were targeted for lower performance evaluations following Lundervold's arrival at the Tigard store. As discussed above, a review of the New Associate Reviews and Performance Evaluations of the K & B Department plaintiffs reveals that, prior to Lundervold's arrival, plaintiffs' performance met or exceeded Home Depot's standards and were without incident. However, a decided decline in the rankings for several plaintiffs occurred following Lundervold's arrival at the Tigard store.

Nelson's New Associate Review of August 12, 1999, rated her performance as "solid" in all categories. Hanchett Aff. (Nelson), Ex. A, pp. 17–18. However, by November 10, 1999, her Performance Appraisal rates her overall performance, her product, department, and store knowledge, and judgment, fell to a ranking of 2. Hanchett Aff. (Nelson), Ex. A, pp. 23–27.

Florea's overall ranking of 4 on July 5, 1999 (Plaintiffs' Ex. 31) decreased to a 3 by December 23, 1999 (Plaintiffs' Ex. 32), and his ranking in virtually every one of the nine specific appraisal categories decreased by at least one score.

Galas was rated as a "solid" performer in every category in a review dated April 29, 1999 (Plaintiffs' Ex. 33), and was given an overall rating of 3 in his Performance Appraisals of July 5, 1999 (Plaintiffs' Ex. 34) and December 19, 1999 (O'Connor Aff. (Galas), Ex. A, pp. 31–35), but his overall rating dropped to a 2 in his Performance Appraisal of June 20, 2000. O'Connor Aff., Ex. B, pp. 1–5.

Home Depot contends that the decreases in plaintiffs' rankings are simply the reflection of ongoing performance problems exhibited by several of the K & B Department plaintiffs. That certainly is one reasonable interpretation of the performance rankings. However, each of the plaintiffs was ranked as providing a "solid" performance or an overall performance of a 3 or 4 prior to Lundervold's arrival. They all contend that after Lundervold's arrival, their performance was micromanaged and they were unjustly criticized and written up. Thus, an equally reasonable interpretation of the decrease in rankings is that those rankings constitute not the documentation of legitimate job performance issues, but a paper trail designed to mask discriminatory treatment. *See, e.g., Winarto v. Toshiba Am. Elec. Components,* 274 F.3d 1276, 1285–86 (9th Cir. 2001) (change in comments in performance review following protected activity is evidence of pretext); *Ross v. Campbell Soup Co.,* 237 F.3d 701, 708 (6th Cir.2001) (sudden drop in performance evaluations evidence of pretext); *Butler v. City of Prairie Vill.,* 172 F.3d 736, 752 (10th Cir.1999) (decline in work evaluations within months of protected activity is evidence of pretext).

This court is sympathetic to an employer's need to document legitimate performance issues, and sensitive to the fact that a reasonable jury may conclude that the decrease in plaintiffs' performance rank-

ings is the benign product of that process. However, plaintiffs have presented evidence of discriminatory comments, as well as a disproportionate number of involuntary terminations of older employees and a corresponding replacement by younger employees. One reasonable inference from plaintiffs' combined submissions is that Lundervold targeted older workers for termination and then systematically carried out a plan of replacing those older, higher paid workers with younger, less costly workers. Thus, this court concludes that the K & B Department plaintiffs have presented evidence sufficient to rebut each of the criticisms levied against them by Home Depot and allow a reasonable factfinder to conclude that the performance issues raised by Home Depot were pretextual.

### 5. *Conclusion*

Based on the above, this court concludes that the age discrimination claims of Florea, Nelso, Bahri, and Galas survive Home Depot's motion for summary judgment.

### C. *Espen*

### 1. *Undisputed Facts*

Espen began working for Home Depot in March 1998. Espen Aff., ¶ 2. For all but the first five weeks of his employment with Home Depot, he worked as a full time sales associate in the Millworks Department. His starting pay with Home Depot was $11.00 per hour. *Id.* When Lundervold became the Assistant Store Manager of the Tigard store about a year after Espen was hired, Espen was 52 years old (born in 1947).

■ Espen alleges that during his tenure with Home Depot, he was paid unfairly and given no opportunity to further his career with Home Depot, because he was denied promotions and training, unjustifiably written up, given inadequate and unfair performance evaluations, and denied requested transfers. *Id.*, ¶¶ 4, 7. On September 18, 2000, Espen filed a complaint with Oregon's Bureau of Labor and Industries ("BOLI") alleging discriminatory treatment and retaliation in the form of unfair pay, undeserved performance evaluations, and the denial of training, and opportunity to further his career with Home Depot. Plaintiffs' Ex. 156.

Espen went on medical leave on April 1, 2001, at age 53 (Espen Aff., ¶ 13), and resigned for "personal reasons" on November 8, 2001 at age 54 (Hanchett Aff. (Espen), ¶ 9, Ex. H). At the time of his last day of work, Home Depot was paying Espen $12.50 per hour.

### 2. *Prima Facie Case*

### a. *Other Adverse Employment Actions*

Espen alleges a host of actions which he alleges were taken against him as a result of his age. Third Amended Complaint, ¶¶ 31–36. Home Depot argues that these actions, taken singly or in combination, simply do not constitute adverse employment actions and that overall, the terms and conditions of his employment remained the same throughout his tenure. The problem with this argument is that it is clear that Espen alleges several interrelated actions, some of which directly caused other adverse actions and effectively precluded him from advancing. According to Espen, he was denied training in favor of a younger, less experienced coworker, Troy Cadwell ("Cadwell"). Plaintiffs' Facts (Espen), ¶ 8. Thereafter, Cadwell rather than Espen was promoted. *Id.* Moreover, because Espen was denied the training, he was unable to meet his Development Plan by the time of his next review. *Id.* This in turn affected his pay increase and caused him not be given a Development Plan for the following year.

Certainly any adverse action should be considered together with any other adverse action that is alleged to have caused it. This court has no trouble concluding that the combination of adverse actions alleged by Espen, which in effect precluded him from advancing, are sufficient to withstand Home Depot's challenge to this aspect of Espen's *prima facie* case.

### b. *Satisfactory Job Performance*

■ As with the K & B Department plaintiffs, Espen has no difficulty meeting the requirement that he show satisfactory job performance sufficient to make a *prima facie* showing. He uniformly met job expectations in his reviews and appraisals prior to Lundervold's arrival. Specifically, his New Associate Review, dated June 14, 1998, ranks his performance as "solid" in all categories, including overall performance. Hanchett Aff. (Espen), Ex. A, pp. 16–17. The Performance Review dated October 2, 1998, also ranks his performance in all categories as 3. *Id.*, Ex. A, pp. 18–19. Although the February 7, 1999 Performance Appraisal ranks Espen as 2 for "being a team player," and 2.5 for judgment, it still gives Espen an overall ranking of 3. *Id.* at 20–24.

Espen did receive a written warning for poor job performance on May 8, 1999, for allegedly turning a customer over to another sales associate in order to take a coffee break. Hanchett Aff. (Espen), Ex. B. However, this single written reprimand is insufficient to negate the series of previous solid performance reviews. In any event, Espen's next Performance Evaluation, dated September 28, 1999, continues to rate Espen's overall performance as 3. Hanchett Aff. (Espen), Ex. A, pp. 25–29. In short, all the reviews completed before Lundervold's arrival at the Tigard store indicate that Espen was satisfactorily performing his job.

### c. *Inference of Discrimination*

■ Home Depot also argues that Espen cannot establish an inference of discrimination. As explained above, Espen contends that he was denied certain training and given unfair performance evaluations which then caused other problems, including denials of promotion and lower pay raises. Apart from that, Espen has presented evidence that he was paid substantially less than other Home Depot employees. Plaintiffs' Ex. 196. After a searching review of the record, this court concludes that Espen, as the other plaintiffs, has presented sufficient evidence of a *prima facie* case.

### 3. *Legitimate Nondiscriminatory Reason*

■ Home Depot asserts that Espen's failure to achieve promotion was due to his own mediocre performance history and not his age. Home Depot has submitted evidence that Espen received a warning for poor customer service in May 1999, and for an "emotional outburst" in August 1999. In addition, Home Depot points out that Espen received ratings of 2 ("Improvement Needed") in multiple areas in his performance evaluations in September 1999, March 2000, September 2000, and March 2001. Finally, Home Depot contends that Espen was plagued with attendance problems.

### 4. *Pretext*

Because Home Depot has proffered evidence of performance problems which facially provide legitimate, nondiscriminatory reasons for the actions taken against Espen, the burden shifts back to Espen to demonstrate that a discriminatory reason more likely motivated Home Depot or that the proffered reasons are unworthy of credence. Espen meets that burden.

First, Espen disputes and has offered explanations to counter Home Depot's criticisms. Espen Aff., ¶¶ 4, 9–11. A reasonable factfinder could conclude that Home Depot's proffered reasons were not the motivating factor behind the criticisms of Espen, but were instead motivated by discrimination against Home Depot's older employees.

Second, Espen's performance reviews show a marked decrease after Lundervold's arrival. Before Lundervold arrived, Espen received many compliments and merit badges for his performance. Plaintiffs' Exs. 144–51. In addition, Espen was rated as a "solid" performer in all categories on his New Associate Review dated June 14, 1998 (Hanchett Aff. (Espen), Ex. A, p. 16) and received overall ratings of 3 on his October 2, 1998 and March 15, 1999 Performance Reviews. *Id.* at 18, 23. Although his overall ratings throughout the remainder of his employment remained at 3 (*id.* at 28, 33, 38), his ratings in specific areas fell dramatically in his September 28, 1999 Performance Review just a few months after Lundervold's arrival. *Id.* at 25–29.

This court concludes that when all the evidence is viewed in the light most favorable to Espen, a reasonable factfinder could find that unlawful age discrimination, rather than legitimate job performance concerns, motivated the adverse actions against Espen. Thus, summary judgment against this claim is inappropriate.

### D. *Roberge*

#### 1. *Facts*

Roberge began working for Home Depot as a sales associate in the Garden Department in March 1997. When Lundervold became the Store Manager of the Tigard store, Roberge was 55 years old (born in 1944). Roberge Aff., ¶ 1. Roberge alleges that he was repeatedly passed over for promotion, denied transfers, and paid less than his younger coworkers. *Id.,* ¶¶ 3, 5–16. Roberge alleges a claim for constructive discharge based on this treatment and his resulting resignation at age 57.

In July 1997, Roberge was involuntarily transferred to the Phone Center Department which he describes as a "dead end position" with very limited possibilities of promotion. *Id.,* ¶ 6. He repeatedly and unsuccessfully attempted to get transferred out of that position so that he could be considered for promotions. *Id.,* ¶¶ 8–11. He was eventually transferred to a position in the Special Services Department in June 1998, only to be transferred back into the Phone Center Department a few months later, where he remained until he was again transferred back into the Special Services Department in January 1999. *Id.,* ¶ 12.

During the course of his employment at Home Depot, Roberge repeatedly registered on Home Depot's computerized Jobs Preference Registration System ("JPRS") and otherwise made his desire to be promoted known to Home Depot. *Id.,* ¶¶ 3–4. In addition, Roberge completed Department Supervisor Training and Head Cashier training, and was a Product Knowledge Master by virtue of completing tests on product knowledge in every department. *Id.,* ¶ 5. His Associate Reviews consistently rated his performance at 3 or 4. Plaintiffs' Exs. 108–114. Despite these apparent qualifications, Roberge was never so much as interviewed for promotion into a department supervisor position. Roberge Aff., ¶ 5. Instead, he was repeatedly passed over in favor of less qualified individuals. *Id.,* ¶¶ 7–10, 13–14, 16.

Roberge's questions to Assistant Store Managers about why he was not being promoted either went unanswered, or were met with comments that it was because of his age. *Id.,* ¶ 3. When he was first transferred into the Phone Center Department,

he was told that he may be "too old" to work on the floor in the Garden Department and that perhaps he would like the operations side of the business better. *Id.,* ¶ 11.

Because he believed he had no chance to be promoted or to receive any further pay increases and could not tolerate those working conditions, Roberge submitted his resignation on August 21, 2000. Plaintiffs' Ex. 116.

### 2. *Prima Facie Case*

#### a. *Constructive Discharge*

■ Home Depot argues that it is entitled to summary judgment against Roberge's age discrimination claim because he cannot show that he was constructively terminated. Roberge's claim turns on his assertion that he was repeatedly denied any promotion despite his repeated registration on the JPRS and his repeated expressions to Home Depot management that he wished to be considered for promotion.

As with Bahri's claim, any single instance of discriminatory failure to promote would be insufficient to support a claim for constructive wrongful discharge. However, Roberge has submitted evidence that he was repeatedly denied even an interview for Department Supervisor positions and that he was repeatedly passed over for promotion. This court concludes that this evidence is sufficient to allow a reasonable fact-finder to conclude that a reasonable person would have found these working conditions intolerable.

#### b. *Failure to Promote*

■ In a failure to promote context, a plaintiff may establish a *prima facie* case of age discrimination by showing that: (1) he was in a protected age group (here, over 40 years); (2) that he was qualified for the position sought; (3) that he was not promoted; and (4) individuals outside of

the protected class were promoted. *Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 672 (9th Cir.1988). Home Depot does not appear to dispute that Roberge is within the protected age group and that younger individuals were promoted. However, Home Depot argues that Roberge cannot establish his *prima facie* case for failure to promote because he cannot show that he applied for and was qualified for any particular job opening. This argument turns on Home Depot's interpretation of the JPRS records.

Home Depot contends that Roberge only applied for certain positions and applied for some of those positions only for a single day, namely the same day he was registering. In short, Home Depot asserts that Roberge either registered incorrectly or registered for jobs which never came open. Defendant's Facts (Roberge), ¶¶ 4–5, 11. This argument might be persuasive if it was clear that the JPRS had been on line for many years, that Home Depot had policies in place requiring that promotion requests be made *only* through the JPRS, that Home Depot ensured that its employees were well trained in using the JPRS, and that the JPRS rarely, if ever, lost information submitted by Home Depot employees. However, the evidence is to the contrary.

■ The JPRS apparently went on line in the spring or early summer of 1998. Roberge Aff., ¶ 4. The JPRS experienced some start-up problems and lost some employees' registration information, and employees were not given any training on how to use the system or on what some of the required fields such as "effective end date" meant. *Id.;* Espen Depo., p. 63. These problems alone seriously undercut Home Depot's reliance on its JPRS records as an indicator of the universe of promotion requests made by Roberge. Moreover, nothing in the record suggests

that promotion requests had to be made *only* through JPRS. From the date of Roberge's initial hiring interview (a year or more before JPRS even came on line) and repeatedly thereafter, Roberge expressed his desire for promotion opportunities, but received no response or was told his failure to get promoted was because of his age. *Id.*, ¶¶ 3–4. This evidence is sufficient to refute Home Depot's argument that Roberge has failed to establish a *prima facie* case of discriminatory failure to promote.

### 3. *Legitimate Nondiscriminatory Reason—Other Hires More Qualified*

■ Even if Roberge clears his *prima facie* hurdle, Home Depot next argues that it had legitimate, nondiscriminatory reasons for its actions, namely that the other employees who were promoted were more qualified than Roberge. Although Roberge strenuously disputes this assertion, this court will assume that the evidence submitted by Home Depot is sufficient to shift the burden back to Roberge. Ultimately, however, it matters not, for Roberge has submitted sufficient evidence of pretext to withstand summary judgment on his failure to promote claim.

### 4. *Pretext*

As noted above, Roberge completed the training necessary to qualify him for promotion to a Department Supervisor position and consistently received high scores on his Associate Reviews. *Id.* ¶ 5; Plaintiffs' Exs. 108–114. Home Depot asserts that one of the individuals promoted (Jim Partin) was insignificantly younger (2 years) than Roberge, that another (Kevin King) had taken significantly more training classes than had Roberge, and that the record is insufficient to proceed on the remaining employees promoted. However, Roberge points out that Kevin King had no Master Gardener certificate, no

gardening experience, and no customer service responsibilities before his promotion, and had not even registered on the JPRS for a promotion in the Garden Department. Roberge attests that he was more qualified than Max Christie and Jay Davis, although there is no analysis of the relative education and experience of these individuals. Next, Roberge attests that Jay Davis, who was promoted over Roberge in January 1999 into the Special Services Department, even though at that time, Roberge was in a "lead" role and was paid more. Roberge Aff., ¶ 13. Home Depot has not countered that information. Finally, 11 other substantially younger employees were promoted to Department Supervisor positions during Roberge's tenure. *Id.*, ¶ 16.

There is certainly room for debate as to whether Roberge was more or less qualified than those employees who were promoted while his own career stagnated. However, the sheer number of promotions, and in particular the fact that Roberge was not even invited for an interview in violation of Home Depot policy is enough to make blind acceptance of repeated promotions of younger employees questionable. The questionable nature of the promotions is even more problematic when the evidence regarding the responses to Roberge's inquiries about why he was not being promoted is considered. He either got no response, or was told he was too old. This is sufficient evidence of pretext to survive summary judgment.

### IV. *Sex Discrimination Claim by Nelson (Second Claim)*

#### A. *Legal Standard*

Both Title VII and Oregon law prohibit gender-based discrimination. 42 USC § 2000e; ORS 659.030(1)(a)-(b). Both statutes require the same proof for a *prima facie* case, namely evidence which

gives rise to an inference of discrimination. *Sischo–Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1110–11 (9th Cir. 1991); *Henderson*, 79 Or.App. at 657, 719 P.2d at 1324. Moreover, as explained above, in federal court, discrimination claims under either Title VII or its state-law counterpart proceed under the *McDonnell Douglas* burden-shifting analysis described above. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Snead*, 237 F.3d at 1090–93.

Claims premised upon alleged gender discrimination may proceed under one or both of two theories, namely hostile work environment or disparate treatment. At oral argument, plaintiffs' counsel clarified that Nelson intends to proceed under both theories. However, a searching review of the record reveals insufficient evidence to support a hostile work environment claim. As a result, Home Depot is entitled to summary judgment against Nelson's Second Claim for Relief insofar as that claim is premised upon a hostile work environment.

**B. *Hostile Work Environment Claim***

**1. *Legal Standard***

 To establish a gender discrimination claim based upon a hostile work environment, Nelson must show that "1) she was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.' " *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995) (internal quotations and citation omitted). The workplace must be both subjectively and objectively abusive. *Id.* Whether the workplace is subjectively abusive depends on the plaintiff's perspective and whether the plaintiff indicated that the conduct was unwelcome. *See Nichols v. Azteca Rest. Enters., Inc.*,

256 F.3d 864, 873 (9th Cir.2001). Whether the workplace is objectively abusive is evaluated "from the perspective of a reasonable person with the same fundamental characteristics" as the plaintiff. *Fuller*, 47 F.3d at 1527. This inquiry turns on several factors including "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Nichols*, 256 F.3d at 872, quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

**2. *Analysis***

 Nelson asserts that Brownlie: (1) repeatedly referred to her as "missy" and to other female employees as "girls;" (2) yelled in her face and ordered her into the office without justification in front of customers and coworkers; (3) belittled her ideas and suggestions and her substantial experience in design; (4) made off-color remarks "in-passing" to male associates; (5) once asked her why she is unable to "get it on the computer" with respect to learning a particular software program used at Home Depot; (6) repeatedly made unwelcome comments about her style of dress, her hair, and shoes; and (7) questioned and made unwelcome comments about her alleged relationship with a male coworker. Nelson Aff., ¶ 6; Nelson Depo., pp. 28, 126. The alleged comments about Nelson's style of dress apparently revolved around complaints to Brownlie by Nelson's coworkers that Nelson dressed like she was "going to a cocktail party." Nelson Depo., p. 125. Brownlie called Nelson into his office and told her that her shoes violated regulation and that other associates were complaining and then asked her not to dress "too fancy" for a home improvement store. *Id.* at 125–26. The incident of questioning Nelson about an alleged

relationship with a male coworker apparently involved a one-time meeting during which Brownlie jointly spoke to Nelson and Galas and asked them what was "going on" between them. *Id* at 58. When they told Brownlie nothing, he was "very punitive" about how a relationship with a coworker would affect their employment. *Id.*

Nelson acknowledges that the harassment she experienced was not as severe as in some cases, but asserts that whether it was severe enough to constitute a hostile work environment is a question of fact for the jury to decide. This court disagrees. The evidence in the record falls far short of that in cases where hostile work environment claims have been allowed to proceed, as exemplified in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Missing from the record is any evidence that Nelson was subjected to overtly sex-based comments or actions such as unwelcome touching, comments about the female anatomy or her anatomy in particular, requests for dates or other sexual favors, or lewd or sexual remarks in her presence. The evidence concerning Brownlie's comments about Nelson's style of dress indicate that Nelson and Brownlie simply disagreed over whether her clothing looked "professional" or "too fancy." Such a disagreement, even when between members of the opposite sex, is not overtly sexual in nature. Moreover, although there is evidence that Ludervold once referred to Nelson with a profane sex-based term (Florea Aff., ¶ 6), there is no evidence that Nelson was aware of that comment until well after her termination. Thus, that evidence does not advance her claim that she was subjected to a hostile work environment. Similarly, the meeting during which Brownlie jointly questioned Nelson and Galas about their relationship provides

no support for a hostile work environment claim since it is obvious that Nelson was not singled out for questioning. While there is some evidence of "off-color" remarks made "in-passing" to male associates, there is no evidence that those comments were sufficiently frequent or severe enough to support a hostile work environment claim.

In short, the evidence in the record simply is insufficient to support a claim based on a hostile work environment theory. Home Depot is therefore entitled to summary judgment against the Second Claim for Relief to the extent it is based on that theory.

### C. *Disparate Treatment Claim*

Home Depot argues that Nelson cannot state a *prima facie* case of sex discrimination because she cannot show that she was performing her job satisfactorily, nor does she submit sufficient evidence to give rise to an inference of unlawful sexual discrimination. Home Depot also argues that Nelson has failed to submit sufficient evidence of pretext in the face of the legitimate reasons it offers for the actions it took against her.

With respect to the job performance issue, as discussed above, Nelson has established that her job performance was satisfactory prior to Lundervold's arrival at the Tigard store. Similarly, as discussed above, Home Depot has offered legitimate, nondiscriminatory reasons for the actions it took against Nelson. Thus, the issue is whether Nelson has submitted sufficient evidence to give rise to the inference that the actions were taken because of her gender and to show pretext by showing that a discriminatory reason more likely motivated Home Depot or by showing that Home Depot's proffered explanation is unworthy of credence.

As noted earlier, Nelson was rated as a "solid" performer who met her job expec-

tations in all categories in her first New Associate Review dated August 12, 1999. Hanchett Aff. (Nelson), Ex. A, pp. 17–18. According to Home Depot, her performance over the ensuing six months deteriorated to the point that it justified firing her in February 2000. The ultimate issue is whether that alleged decline in performance was really due to Nelson's shoddy performance, or was due to gender discrimination against her by Home Depot managers. Nelson submitted evidence in an effort to show that she was subjected to a sufficiently hostile work environment at Home Depot. Although that evidence is insufficient to support such a claim for the reasons discussed above, it is sufficient to give rise to an inference that the actions taken against her were due to gender, and to cast doubt on Home Depot's facially acceptable reasons for her discharge. .Nelson's complaints clearly have a gender-based component, and the responses elicited by Home Depot managers concerning Nelson also clearly have a derogatory gender component. And Nelson attests that these same actions were not taken against male Home Depot employees.

Home Depot argues that Nelson's positions on her age and gender claims are inconsistent and that to the degree she proves one claim, she disproves the other. Suffice it to say that, viewing the entire record in the light most favorable to Nelson, there is sufficient evidence that something more sinister than shoddy work performance was afoot and that instead, age and/or gender discrimination was really the driving force behind Nelson's discharge. As a result, Nelson's Title VII disparate treatment claim also survives summary judgment.

## V. *Retaliation and Wrongful Discharge Claims (Third and Fourth Claims)*

Because the applicable legal standards are similar, the retaliation and wrongful discharge claims are discussed together.

### A. *Legal Standard*

#### 1. *Retaliation Claims*

The ADEA, Title VII and Oregon law prohibit retaliation against an employee because the employee has taken action to oppose discriminatory employment practices. 29 USC § 623(d); 42 USC § 2000e–3(a); ORS 659.030(1)(f). The same burden-shifting methodology discussed above is employed for claims involving retaliation. *See, e.g., Ray,* 217 F.3d at 1240; *Steiner,* 25 F.3d at 1464–65; *Rose,* 902 F.2d at 1420; *Snead,* 237 F.3d at 1090–93.

■ A plaintiff may establish a *prima facie* case of discriminatory retaliation by showing that: (1) he or she engaged in a protected activity; (2) he or she was subjected to an adverse employment action; and (3) that there was a causal link between the protected activity and the adverse employment action. *Morgan v. National RR Passenger Corp.,* 232 F.3d 1008, 1017 (9th Cir.2000), citing *Yartzoff,* 809 F.2d at 1375; *Wallis,* 26 F.3d at 888–89; *Harris v. Pameco Corp.,* 170 Or.App. 164, 178–79, 12 P.3d 524, 533 (2000).

The statutes making retaliation unlawful do not use the term "protected activity." Instead, Title VII, the ADEA, and ORS Chapter 659 make it unlawful to discriminate against any individual because the person has "opposed" unlawful employment practices, or because the person has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" alleging gender or age discrimination. 42 USC § 2000e–3(a); 29 USC § 623(d); ORS 659.030(1)(f). And, as discussed above, "only non-trivial employment actions that would deter reasonable employees from complaining about Title VII violations will constitute actionable retaliation." *Brooks,* 229 F.3d at 928 (citation omitted).

### a. Causation Standard Under Federal Law

Assuming a plaintiff establishes that he or she engaged in protected activity and suffered an adverse action, the plaintiff then must establish a causal link between those two elements. "Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity." *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir.1982) (citations omitted). To show the requisite causal link, plaintiffs must "present evidence to raise the inference that [the] protected activity was the likely reason for the adverse action." *Id.*

■■■■■ In the Ninth Circuit, "[c]ausation sufficient to establish a *prima facie* case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge." *Miller v. Fairchild Indus., Inc.* 797 F.2d 727, 731 (9th Cir. 1986), *aff'd in part, rev'd in part on other grounds*, 885 F.2d 498 (1989) (*en banc*) (citations omitted). However, where an employer has "already decided upon a course of action adverse to the plaintiff prior to learning of the plaintiff's protected activity," there is no basis to infer retaliatory motive. *Id* at 797 F.2d 727 n. 1, citing *Cohen*, 686 F.2d at 797. Moreover, where an adverse action follows closely on the heels of protected activity, "an inference of retaliation is ... not compelled where other evidence provides a reasonable basis for inferring that adverse action was not retaliatory." *Knickerbocker v. City of Stockton*, 81 F.3d 907, 912 (9th Cir.1996), citing *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir.), *cert denied*, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

### b. Causation Standard Under State Law

■■■■ Oregon uses a " "substantial factor" test to determine whether the plaintiff's protected activities were the cause of defendant's adverse actions." *Seitz v. Albina Human Res. Ctr.*, 100 Or.App. 665, 674, 788 P.2d 1004, 1010 (1990), citing *Holien v. Sears Roebuck & Co.*, 298 Or. 76, 90, 689 P.2d 1292 n. 5, 298 Or. 76, 689 P.2d 1292, 1299–1300 n. 5 (1984). "[T]o be a substantial factor, the employer's wrongful purpose must have been 'a factor that made a difference' " in the decision to take the adverse action. *Estes v. Lewis and Clark Coll.*, 152 Or.App. 372, 381, 954 P.2d 792, 796, *rev denied*, 327 Or. 583, 971 P.2d 411 (1998), quoting *Nelson v. Emerald People's Util. Dist.*, 116 Or.App. 366, 373, 840 P.2d 1384, 1390 (1992), *aff'd in part, rev'd in part*, 318 Or. 99, 862 P.2d 1293 (1993).

This court is aware of no Oregon case explicitly deciding whether timing of an adverse action alone is sufficient for a plaintiff to make out a *prima facie* case of retaliation under ORS Chapter 659. However, at least one Oregon case reviewing an Employment Relations Board decision dealing with an analogous issue has stated that " '[t]he causal connection is typically based on proximity in time between the protected activity and the employer's action, *coupled with attending circumstances that suggest something other than legitimate reasons for the temporal tie.*" *Portland Ass'n of Teachers v. Multnomah Sch. Dist. No. 1*, 171 Or.App. 616, 625, 16 P.3d 1189, 1197 (2000), quoting *Amalgamated Transit Union, Div. 757 v. Tri–County Metro. Transit Dist.*, 17 PECBR 780, 787 (1998) (emphasis added). Another Oregon case overturned a trial court's grant of a motion for judgment notwithstanding the verdict on a retaliatory discharge claim because the plaintiff offered evidence of

the suspicious timing of her termination, coupled with other statements by the employer. *Wooton v. Viking Distrib. Co., Inc.,* 136 Or.App. 56, 899 P.2d 1219 (1995). These cases suggest, as does the federal cases cited above, that Oregon courts reject an inference of retaliation where other evidence provides a reasonable basis for inferring that an adverse action was not retaliatory.

### 2. *Wrongful Discharge*

■■■ In this case, several plaintiffs also allege a state law claim for wrongful discharge. An employee may bring a wrongful discharge claim if the employee in good faith reports a belief that he or she was discriminated against in violation of Oregon's anti-discrimination laws and the employer terminates him or her for reporting the discrimination. *McQuary v. Bel Air Convalescent Home, Inc.,* 69 Or.App. 107, 111, 684 P.2d 21, 23–24, *rev denied,* 298 Or. 37, 688 P.2d 845 (1984). Additionally, in Oregon, a claim for wrongful discharge may be premised upon exercising a job-related right of important public interest, such as complaining about unlawful discrimination. *Draper v. Astoria Sch. Dist. No. 1C,* 995 F.Supp. 1122, 1127 (D.Or.1998) (citations omitted); *Holien,* 298 Or. at 90–91, 689 P.2d at 1299–1300.

As with a retaliation claim, a plaintiff is required to show a causal connection between the exercise of the employment-related right (opposing the discrimination) and the adverse employment action. *Shockey v. City of Portland,* 313 Or. 414, 422–23, 837 P.2d 505, 509–10 (1992), *cert denied,* 507 U.S. 1017, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993).

### a. *Wrongful Discharge Claims Not Precluded by Adequate Remedy*

■■■ As a preliminary matter, Home Depot argues that plaintiffs may not assert a claim for wrongful discharge because the ADEA provides them with an adequate statutory remedy. This court has rejected the argument that Title VII provides an adequate statutory remedy precluding a claim for wrongful discharge. *Wells v. P/M Indus., Inc.,* 2000 WL 64271 *8 (D.Or. January 24, 2000), citing *Kent v. Liberty NW Ins. Corp.,* Civil No. 98–635–JE (September 18, 1998). In contrast to Title VII, Home Depot argues that the ADEA provides an adequate remedy because it does not make its remedies dependent upon the number of employees working for a particular employer and provides for lost pay, liquidated damages, attorney fees, and the right to a trial by jury. This court, however, disagrees that these remedies are sufficient to preclude a wrongful discharge claim.

The ADEA does limit the entities within its reach. Specifically, it limits the entities covered to those which have 20 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year. 29 USC § 630(b). Moreover, the ADEA's damages provisions are not without limitation:

> [T]here are two important constratints on courts' remedial power under the ADEA. First, ... the ADEA specifically provides that "liquidated damages shall be payable only in cases of willful violations of this chapter." Second, the Courts of Appeals have unanimously held ... that the ADEA does not permit a separate recovery of compensatory damages for pain and suffering or emotional distress.

*Commissioner of Internal Revenue v. Schleier,* 515 U.S. 323, 326, 115 S.Ct. 2159, 132 L.Ed.2d 294 (1995), quoting 29 USC § 626(b) and citing *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 125, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985) (footnote and remaining citations omitted).

These deficiencies in the ADEA's remedial provisions leave the door open to plaintiffs' claims for wrongful discharge.

### b. Claims for Constructive Wrongful Discharge Also Not Precluded

Home Depot also argues that Bahri and Roberge have no claims for a constructive discharge because they abandoned their jobs or voluntarily quit. For the same reasons discussed above with respect to these plaintiffs' disparate treatment claims, this argument is rejected with respect to these plaintiffs' retaliation and wrongful discharge claims.

### B. Prima Facie Case

As discussed above, all plaintiffs except Toles allege claims for retaliation in violation of the ADEA and ORS Chapter 659 and for wrongful termination premised upon opposing unlawful age discrimination. Third Amended Complaint, ¶ 71. Additionally, plaintiffs Florea, Nelson, and Galas allege claims for retaliation in violation of Title VII and ORS Chapter 659 and for wrongful termination premised upon opposing unlawful gender-based discrimination. *Id.*, ¶ 72. As discussed below, these claims survive summary judgment, with the exception of the claims by Bahri and the claims by Florea, Nelson, and Galas based on retaliation for complaints of age discrimination.

### 1. Protected Activity

Home Depot's primary argument against the retaliation and wrongful discharge claims is that plaintiffs simply never engaged in any protected activity. Specifically, Home Depot contends that plaintiffs' complaints, to the extent they made any at all, were too amorphous to alert Home Depot that plaintiffs were op-posing unlawful gender or age discrimination.

### a. Gender Discrimination

Florea, Nelson, and Galas each contend that they opposed unlawful gender-based discrimination. Home Depot counters that these employees made only generalized complaints about the mistreatment of Nelson who happens to be a female, and that such complaints were insufficient in and of themselves to alert Home Depot to gender-based discrimination.

### i. Florea

■ Florea testified that he made generalized complaints to Home Depot management that he and his coworkers were being "unmercifully harassed" and that the form of the harassment was "verbal, physical, monetary, and what [he] would classify as character assassination." Florea Depo., pp. 154–58. In addition, shortly before his termination, Florea complained to Lundervold about Nelson being harassed and discriminated against and Lundervold responded by saying that he was "getting rid of that overpaid cunt." Florea Aff., ¶ 6.[16]

Home Depot contends that Florea's testimony lacks any indication that he conveyed to Home Depot management that harassment of him and his coworkers, including Nelson, was gender-based. Home Depot points out that Florea testified that at the time he made his complaints, he "didn't understand the source of the harassment" and that he thought it "strange" that this type of harassment was being experienced by the "top producers in the company." Florea Depo., p. 157. According to Home Depot, this testimony indicates that Florea was complaining generally about perceived mistreatment of

---

**16.** Florea asserted that he believed Nelson's treatment was gender-based, but this court struck his affidavit testimony to that effect as irrelevant.

good people, not specifically about age or gender discrimination.

The difficulty with Home Depot's argument is the evidence that during Nelson's employment, she was subjected to demeaning comments which clearly have a gender component (*i.e.* being called "missy" or "girls"). Moreover, Lundervold's response to Florea's concerns about "harassment" and "discrimination" against Nelson incorporated a demeaning gender-specific term. When viewed in that context, Florea's complaints about harassment and discrimination against Nelson necessarily included a gender component and thus constitute protected activity for purposes of Title VII.

While Florea's proof on this point is extremely weak, this court is unwilling at this point to grant summary judgment against his retaliation claim based solely on the basis that his complaints, generalized though they were, were insufficient to constitute protected activity for Title VII purposes. This court therefore denies Home Depot's request for summary judgment against Florea's claims for retaliation and wrongful discharge to the extent those claims are premised upon opposing unlawful gender-based discrimination. However, Florea is cautioned that absent proof that Home Depot management was aware or should have been aware of the nature of the alleged harassment or discrimination against Nelson (and therefore of the context in which Florea's complaints arose) prior to the time of Florea's generalized complaints, Home Depot will be granted judgment against that portion of Florea's Third Claim premised upon opposing unlawful gender-based discrimination.

#### ii. *Nelson*

■ Nelson attests that early on and "continuously throughout" her employment, she complained to management about the "harassment" and "discrimina-

tion" to which she was subjected. Nelson Aff., ¶ 10. Nelson does not indicate that she specifically stated the nature of the alleged harassment and discrimination by telling management that she thought it was age or gender based. However, just as with Florea's complaints about the treatment of Nelson, Nelson's complaints about her own treatment must be viewed in context. This court is sympathetic to Home Depot's assertion that the mere fact that Nelson is a woman complaining about "harassment" or "discrimination" is not enough to alert the employer to unlawful sex-based discrimination and that portions of Nelson's deposition presently in the record do not clearly describe the exact nature of Nelson's complaints.

However, the record does support the conclusion that at least some of the conduct about which Nelson was complaining had a gender component. *Id.*, ¶ 6. An employee need not utter the magic words "Title VII" to put an employer on notice of unlawful discrimination. Viewing the evidence in the light most favorable to Nelson indicates that she complained about "harassment" and "discrimination" and that the specific conduct about which she complained was gender-based. As with Florea's evidence concerning his protected activity, this is sufficient for Nelson's claims for retaliation and wrongful discharge claims premised upon opposing unlawful gender-based discrimination to squeak past summary judgment.

#### iii. *Galas*

■ The retaliation and wrongful discharge claims by Galas also survive the inquiry of whether Galas engaged in protected activity. Unlike Florea and Nelson, Galas attests that he specifically complained about "sex discrimination" directed at Nelson and other female employees. Galas Aff., ¶ 6. Those complaints included

complaints that Brownlie constantly told sexually inappropriate jokes in the workplace, singled out Nelson for counseling and discipline, and terminated Nelson for false and pretextual reasons. *Id;* Galas Depo., pp. 90–98, 201–04. As with the complaints by Florea and Nelson, the fact that Galas was complaining about conduct which clearly had a gender component precludes summary judgment against the retaliation and wrongful discharge claims by Galas on the ground that Galas never engaged in protected activity.

### b. *Age Discrimination*

### i. *Kitchen Designers*

 All remaining plaintiffs except Toles allege claims for retaliation and wrongful discharge based on their acts of opposing unlawful age discrimination. Of those, this court concludes that the claims of the Kitchen Designer plaintiffs fail to survive summary judgment for failure to make a sufficient showing that they alerted Home Depot that they were opposing unlawful age-based discrimination.

Bahri attests that he "repeatedly complained ... about being harassed and discriminated against, which [he] believed to have been age based" and that thereafter, his time off to take the CKD test was denied, his transfer to another store was revoked, and he was suspended from work without pay and wrongfully terminated. Bahri Aff., ¶¶ 7–8. Bahri also testified that he complained to Midgley, Fitzgibbon, and Sanford. Bahri Depo., p. 103. However, other than his testimony that he complained about the amount of time it took to get his transfer approved, nothing in Bahri's deposition excerpts reveals the nature or content of those complaints. Bahri Depo., pp. 82–83, 103–04. Lundervold testified that Bahri complained about being assigned to aisle sales, about his denied transfer, and about his wages. Lundervold Depo., pp. 77–78. However,

nothing in that testimony indicates that Bahri alerted Lundervold that he believed those actions were directed at him due to his age. Finally, Bahri asserts that he was asked to provide information about Florea prior to Florea's termination, but that he refused to do so. However, again nothing indicates that Bahri told anyone that the reason he would not do so was because he believed that the actions against Florea were age-based.

Similarly, Nelson complained about the "harassment and discrimination [she] was being subjected to, which [she] believed to be based on [her] age and/or gender." Nelson Aff., ¶ 10. As with Bahri's deposition testimony, Nelson's deposition testimony is devoid of evidence that her complaints were intended to oppose unlawful age-based discrimination. And, unlike her complaints about specific conduct that had a gender component, her other generalized complaints are insufficient to alert Home Depot about the nature of her complaints.

Galas also attests that he "complained to management about the harassment and discrimination of myself and other older coworkers, which I believed to be age-based." Galas Aff., ¶ 5. Despite his subjective belief, nothing in the record indicates that Galas told anyone in Home Depot management of his belief. He specifically complained about the termination of Nelson to Lundervold, but did not tell Lundervold he thought her termination was age-based discrimination. Galas Depo., pp. 92–93.

While it is true that all the individuals about whose treatment these plaintiffs complained were older workers, an employer cannot be expected to distill that fact out of a multitude of general complaints about the treatment of employees. Thus, without some evidence to alert the employer that unlawful age discrimination was at play, such as age-based conduct or

comments, such complaints are insufficient to constitute protected activity for purposes of the ADEA.

### ii. *Espen*

██ Espen asserts that beginning in late 1999, he repeatedly complained to management about unfair treatment. Espen Aff., ¶ 8. In particular, he complained during his performance reviews. Espen Depo., pp. 90–91. When Lundervold became the Store Manager, he flatly asked him whether his age would result in discrimination against him. *Id* at 91–92. Although Espen never complained to district management, he "went in to vent [his] frustrations" to Scott Southard ("Southard") (in Home Depot's Human Resources Department) about the seeming contradiction between Home Depot's philosophy of performance-based promotions and his own stagnant career. *Id* at 92–93; Southard Depo., pp. 16–17. He vented these same frustrations to Assistant Store Manager Paul VanDyke, who told him that he would not be promoted because of his age. Espen Depo., pp. 95–96.

Espen filed a BOLI complaint on September 18, 2000, and became a party to this lawsuit on November 2, 2000. Obviously, a BOLI complaint and a lawsuit charging discrimination are protected activity. Although the record is less than clear about the specific adverse employment actions that took place following his BOLI compliant, he does assert that he was unjustly written up for absences in February and March 2001. This is sufficient to defeat Home Depot's argument concerning a lack of protected activity.

### iii. *Roberge*

██ Roberge repeatedly questioned and complained about his transfers to dead-end positions, lack of interviews, and lack of promotions. Roberge Aff., ¶¶ 3, 11, 18. His questions and complaints were specific to age, as were the responses those questions and complaints generated. When he told managers of his interest in promotion and asked whether he was not promoted due to his age, he received little or no response. *Id.* ¶ 3 When he complained of his transfer to the Phone Center Department to Assistant Store Manager Jason Thornton ("Thornton"), he was told he was "too old" to work on the floor in the Garden Department. *Id.* ¶ 11. When viewed in the light most favorable to Roberge, this is sufficient for a reasonable factfinder to conclude that Home Depot was on notice that Roberge was complaining about age discrimination.

### C. *Causal Link Between the Protected Activity and the Adverse Actions*

██ Home Depot also argues generally that plaintiffs cannot show a causal link between their complaints and any adverse actions. For the most part, those arguments are directed at whether plaintiffs in fact engaged in any protected activities or suffered any adverse actions. As specified above, plaintiffs have met their burden on those issues.

Home Depot makes only one argument that directly challenges the causal link between protected activities and adverse actions, and that argument relates to Galas. Home Depot points out that Nelson was terminated in February 2000, and Galas was terminated some 10 months later in December 2000. According to Home Depot, Galas' complaints about Nelson's termination are simply too far removed in time to support an inference that Galas's termination was based on his complaints about Nelson's termination.

However, the cases relied on by Home Depot are distinguishable. In three of the cases, the courts simply determined that where the only link between the alleged protected activity and the alleged adverse

action is temporal proximity, the timing of the adverse action must be both after, and sufficiently close in time to, the protected activity to provide the requisite causal link. *Clark Co. Sch. Dist. v. Breeden,* 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (no causal connection shown where supervisor decided on transfer prior to learning of protected activity and transfer did not take place until one month later); *Richmond v. ONEOK, Inc.,* 120 F.3d 205, 209 (10th Cir.1997) ("three-month period between the activity and the termination, standing alone, does not establish a causal connection"); *Hughes v. Derwinski,* 967 F.2d 1168, 1174 (7th Cir.1992) (four months between protected activity and first disciplinary letter, and more than three years before second disciplinary letter). The remaining case found the causal connection severed by evidence that the employer had a chance to take the alleged adverse action (lay off) during an earlier round of layoffs, but had not done so. *Wells,* 2000 WL 64271 at \*7.

While a ten month period between a complaint and adverse action might be insufficient, standing alone, to establish causation, Galas' termination was not the first alleged adverse action taken following his complaint. Instead, Galas contends that he received unjust performance criticisms, was harassed about his relationship with Nelson, and received an unjustified performance review in June 2000. Galas Aff., ¶ 7. In short, Galas contends that the ultimate goal was to terminate him, but that other adverse actions leading up to that goal were also taken. In such a case, "while retaliatory intent may be inferred from adverse action which 'closely followed' the plaintiff's protected activity, 'the phrase "closely followed" must not be read too restrictively where the pattern of retaliatory conduct begins soon after the [protected activity] and only culminates later in actual discharge.'" *Richmond,* 120 F.3d at 209, quoting *Marx v. Schnuck*

*Markets, Inc.,* 76 F.3d 324, 329 (10th Cir.), *cert denied,* 518 U.S. 1019, 116 S.Ct. 2552, 135 L.Ed.2d 1071 (1996) (emphasis omitted).

**D. Legitimate Nondiscriminatory Reason**

As discussed above, Home Depot has proffered legitimate, nondiscriminatory reasons for taking the actions it did against plaintiffs, thus shifting the burden back to plaintiffs to rebut those reasons by providing evidence that unlawful discrimination more likely motivated the adverse action or by demonstrating that Home Depot's proffered reasons are unworthy of credence.

**E. Pretext**

■ This court has concluded that only the *prima facie* cases of Florea, Nelson, and Galas for retaliation and wrongful discharge based on opposition to gender-based discrimination and the *prima facie* cases of Espen and Roberge for retaliation and wrongful discharge based on opposition to age-based discrimination survive summary judgment. As discussed above, the record contains sufficient evidence to support the conclusion that the nondiscriminatory reasons offered by Home Depot for the adverse employment actions taken against these plaintiffs are pretextual. For these same reasons, this court rejects Home Depot's argument that it is entitled to summary judgment against the retaliation and wrongful discharge claims of these plaintiffs on the basis that the record does not support a finding of pretext.

*CONCLUSION*

For the reasons stated above, Home Depot's motions for summary judgment against the claims of Bahri (docket # 109), Florea (docket # 105), Nelson (docket

# 101), Galas (docket # 113), Espen (docket # 150), and Roberge (docket # 154) are granted in part and denied in part as detailed in this court's Order dated October 7, 2002 (docket # 201).